UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JONATHAN WHEELER-WHICHARD,

                          Plaintiff,                      10-CV-358S(Sr)

v.

R.N. MARK DELAURO,
DR. WESLEY CANFIELD,
NURSE PRACTITIONER WENDELYN RUIZ,
DR. JAMES EVANS,
DR. JADOW RAO, and
P.A. DEBBIE GRAF,

                          Defendants.

---

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. #44.

Plaintiff, a former inmate of the New York State Department of Corrections and Community Supervision ("NYSDOCCS"), filed this *pro se* action on or about April 30, 2010 seeking relief pursuant to 42 U.S.C. § 1983 based upon allegations of denial of adequate medical care at the Attica, Wyoming and Southport Correctional Facilities. Dkt. ##1 & 45.

Currently before the Court is defendants' motion for summary judgment. Dkt. #85. Although plaintiff filed an affirmation and Memorandum of Law in support of

summary judgment, he did not file a notice of motion for summary judgment. Dkt. ##83-84. Despite this omission, the Court has considered his legal arguments. For the reasons set forth below, however, plaintiff's arguments are determined to lack merit and it is recommended instead that defendants' motion be granted.

## FACTUAL BACKGROUND

On May 14, 2009, plaintiff complained of left flank pain to Registered Nurse ("RN"), Mark DeLauro at the Southport Correctional Facility ("Southport"). Dkt. #85-1, ¶ 24. RN DeLauro noted thickening of an old scar on plaintiff's left flank and dispensed Motrin to plaintiff while he remained on the medical call out list. Dkt. #85-1, ¶ 24. On June 11, 2009, plaintiff again complained of pain along the scar on his left flank to RN DeLauro, who noted that plaintiff would continue to be monitored. Dkt. #85-1, ¶ 25.

Dr. Canfield reviewed plaintiff's medical chart on July 17, 2009 following plaintiff's complaints of left heel pain. Dkt. #85-3, p.5. Dr. Canfield did not believe surgery was indicated as x-rays did not reveal a bone spur or growth. Dkt. #85-3, p.5.

Following a hearing on July 22, 2009, the Inmate Grievance Review Committee informed plaintiff that he

> is on the eye clinic list which he has been told by the block nurses. The waiting list is 2-3 months and he is on the schedule for the August clinic. His foot problem is callous formation on his heels. He is on the minor surgery clinic list however this is an elective procedure and will be done when time permits. There is an x-ray report in the record that

> documents no bone spur or other bony malformation in the heel that might cause him to develop a callous. He has an old stab wound site on the flank area where he has pain. He refuses to take pain medication. He has been advised that the pain is most likely related to internal scarring from the old stab wound. Each time he has been seen at sick call issues have been addressed and sick call responses have been sent in repose to his questions. He needs to continue to address his needs at routine sick call. C. Felker, NAI recommends for grievant to try Tylenol or Ibuprofen OTC for pain control.

Dkt. #88, p.22.

On July 27, 2009, plaintiff continued to complain of pain in his left flank and advised RN DeLauro that the Motrin was not effective. Dkt. #85-1, ¶ 27. RN DeLauro instructed plaintiff to await the results of pending urinalysis tests. Dkt. #85-4, p.8. Following similar complaints on July 31, 2009, RN DeLauro noted plaintiff's denial of nausea and absence of changes in bowel or bladder and again advised plaintiff to await urinalysis results. Dkt. #85-4, ¶ 9.

On August 9, 2009, plaintiff advised RN DeLauro that he thought he may have passed out while transferring from his toilet to his bunk, but did not complain of injury, was vague with details and deferred examination of vitals or laboratory tests previously ordered. Dkt. #85-4, p.10.

On August 19, 2009, RN DeLauro noted that plaintiff was able to transfer and ambulate within normal limits, demonstrated no outward signs of pain, did not complain of bowel, bladder or appetite issues, and did not complain of flank pain when seen by PA Oakes on August 13th. Dkt. #85-4, ¶ 11.

On August 21, 2009, RN DeLauro notified PA Oakes that plaintiff sought a medical call out for his left flank plain. Dkt. #85-4, ¶ 12. RN DeLauro noted plaintiff's "long history of complaints" and negative urinalysis results. Dkt. #85-4, ¶ 12.

On August 24, 2009, RN DeLauro confirmed that plaintiff was on the medical sick call list. Dkt. #85-4, ¶ 13.

Dr. Canfield examined plaintiff on September 4, 2009, noting the plaintiff's latisimus, serratus anterior, intercostals and oblique muscles were tender to palpitation. Dkt. #85-3, ¶ 6. Noting no concerns regarding plaintiff's recent blood work, Dr. Canfield prescribed Flexeril 10mg at bedtime for seven days, with three refills, and stretching exercises. Dkt. #85-3, ¶ 6.

On September 11, 2009, plaintiff advised RN DeLauro that the Flexeril was working but requested testing for H.Pylori (a stomach virus), due to his left flank pain. Dkt. #85-4, ¶ 16. RN DeLauro noted that plaintiff did not complain of heart burn, GI issues or upper GI distress during hours of sleep and would continue to be monitored. Dkt. #85-4, ¶ 16.

On September 16, 2009, plaintiff requested a PSA test to screen for prostrate cancer because he feared he had the same cancer as Patrick Swayze, however, RN DeLauro noted that plaintiff reported no symptoms. Dkt. #85-4, ¶ 17.

On September 18, 2009, plaintiff informed RN DeLauro that the current pain medication was not working and, despite a lack of symptoms suggestive of a sexually transmitted disease, requested STD testing. Dkt. #85-4, ¶ 18.

On September 18, 2009, Dr. Canfield reviewed plaintiff's chart in anticipation of plaintiff's transfer to the Attica Correctional Facility ("Attica"), and noted that plaintiff's August 7th urine sample for diagnosis of infection was contaminated (plaintiff had not provided a clean catch sample). Dkt. #85-3, ¶ 7. Dr. Canfield reordered the urine test and ordered follow up subsequent to the urinary test results. Dkt. #85-3, ¶ 7. Dr. Canfield also ordered follow up for plaintiff's complaints of flank pain. Dkt. #85-3, p.7.

Plaintiff transferred to Attica on September 24, 2009. Dkt. #85-4, ¶ 19.

On November 2, 2009, plaintiff was seen by Nurse Practitioner ("NP"), Ruiz for complaints of left foot pain and low back pain. Dkt. #85-8, ¶ 5. NP Ruiz observed that plaintiff was able to perform both active and passive range of motion with his left foot and back and provided plaintiff with a large ankle sleeve, a back brace and Ibuprofen as needed. Dkt. #85-8, ¶ 5.

On November 27, 2009, plaintiff complained of right forearm pain and low back pain on the left side of his body and indicated to NP Ruiz that he wanted an MRI. Dkt. #85-8, ¶ 6. NP Ruiz observed that plaintiff was able to perform active and passive

range of motion to his back and that his grip strength was "OK." Dkt. #85-8, ¶ 6. NP Ruiz ordered Naproxen and Flexeril and encouraged plaintiff to wear his back brace. Dkt. #85-8, ¶ 6. She also recommended physical therapy. Dkt. #85-8, ¶ 6.

A consult with physical therapy on December 14, 2009 noted plaintiff believed he was "sick from disease," and determined that objective findings did not warrant follow up, but recommended a psychiatric consult. Dkt. #45-2, p.21.

On March 4, 2010, Dr. Evans examined plaintiff regarding elevated IGE laboratory results suggesting arthritis and a knee x-ray suggesting Old Osgood-Schlatter Disease (an irritation of the patellar ligament at the tibial tuberosity). Dkt. #85-5, ¶ 5. Dr. Evans requested referral to a rheumatologist for follow up consultation, explaining:

> 30 y/o male with polyarthralgia and CVA tenderness. X-rays of knee show a finding compatible with Old Osgood-Schlatter disease. Arthritis work up by primary provider has uncovered elevated IGE with no positives on allergy panel indicating the possibility of connective tissue disorder or another disorder such as autoimmune. Please evaluate and recommend.

Dkt. ##45-3, p.10 & 85-5, ¶ 5.

On April 9, 2010, plaintiff underwent a remote consultation by video with Dr. Morell, a rheumatologist, who ordered a nerve conduction test and bone scan to diagnose potential autoimmune or connective tissue disease. Dkt. #85-5, ¶ 6.

On May 5, 2010, Dr. Evans explained to plaintiff Dr. Morell's recommendation for a bone scan. Dkt. #85-5, ¶ 7.

On June 11, 2010, Dr. Evans examined plaintiff following complaints of stomach pains and recommended a high fiber diet. Dkt. #85-5, ¶ 8.

On August 4, 2010, Dr. Evans resubmitted a request for a bone scan following an initial denial and ordered an SMA 24 panel of multiple blood tests, which returned normal results. Dkt. ##45-3, p.21 & 85-5, ¶ 9.

On September 2, 2010, plaintiff complained of bone pain and was advised by Dr. Evans that he had resubmitted the request for a bone scan and was following up with rheumatology. Dkt. #85-5, p.9. Dr. Evans' request for consultation with rheumatology states that plaintiff complained of "progressive worsening of polyarthralgia" with "no definitive serologi[c] diagnosis." Dkt. #45-4, p.5.

Plaintiff underwent a whole body bone scan on September 16, 2010, which revealed the following:

> Areas of increased uptake in the knees, ankles and shoulders bilaterally, in favor of representing degenerative changes with similar findings seen in the elbows bilaterally.
>
> Findings suggesting a small photopenic area seen in the sacrum to the left of the midline. This is non-specific and could be related to a bone island. A pelvic x-ray may prove helpful. If a pelvic x-ray fails to reveal any abnormality, a CT scan of the pelvis utilizing bony AGO rhythm with attention to this area may prove helpful if clinically indicated.

Dkt. #85-5, p.10.  Dr. Evans informed plaintiff that he would be referred for follow up with a rheumatologist.  Dkt. #85-5, ¶ 11.

On November 2, 2010, Dr. Rao informed plaintiff that his bone scan revealed plaintiff to have a bone cyst and informed plaintiff that he would re-evaluate the need for a CT scan or MRI if his symptoms persisted.  Dkt. #85-5, ¶ 5.  Dr. Rao noted that plaintiff was scheduled for blood tests to check his arthritic status, including an Anti Nuclear Antibody test for autoimmune disease and a C-Reactive Protein test for inflammatory process.  Dkt. #85-7, ¶ 5.

Plaintiff affirms that during a remote consultation via video with another physician, a CT scan was recommended.  Dkt. #83, ¶ 44.  On December 9, 2010, Dr. Rao responded to plaintiff's grievance requesting a CT Scan or MRI by stating that he did not see any definite reason for such tests at the time.  Dkt. #85-7, ¶ 7.

On December 29, 2010, plaintiff filed another grievance, stating he had been having left flank pain for two years and could have cancer.  Dkt. #85-7, ¶ 7.  Dr. Rao noted that plaintiff "did not have any nausea or vomiting, no loss of weight, no urinary symptoms, no hemotocheyica, no hamoturia, and no rheumatology," but agreed to request a CT scan of the sacro-iliac area.  Dkt. #85-7, ¶ 7.

Plaintiff underwent an MRI of his pelvis on January 28, 2011, with unremarkable results.  Dkt. #85-7, p.9.

On March 16, 2011, Physician Assistant Deborah Graf at Wyoming informed plaintiff of the results of the MRI, but plaintiff "was unwilling to accept the results and had strong feelings something was wrong." Dkt. #85-6, ¶ 5. Plaintiff requested a specialized diet even though his blood pressure and cholesterol were within normal limits. Dkt. #85-6, ¶ 5. At plaintiff's request, PA Graf placed plaintiff on a scheduled call out with Dr. Shiekh, the Medical Director at Wyoming. Dkt. #85-6, ¶ 5.

On June 4, 2011, plaintiff underwent a pelvic CT, revealing

> an umbilical hernia which does contain bowel. There is an urachal remnant identified extending from the anterior aspect of the bladder. There is no evidence of bowel dilation to suggest obstruction. The appendix is visualized and is normal in appearance. There is no evidence of focal pelvic lesions. Evaluation of the bones reveals no discreet focal lesions. There is a tiny bone island noted in the intertrochanteric region of the left hip. There is no evidence of fracture. There is no evidence of sclerosis or erosion in the SI joints. The visualized portion of the spine is unremarkable.

Dkt. #85-6.

Plaintiff suffered a fracture to his left index finger on June 13, 2011, and was scheduled for an orthopaedic consult by PA Graf. Dkt. #85-6, ¶ 6.

On August 22, 2011, PA Graf trimmed a callus on plaintiff's left heel and scheduled him for a visit with podiatry. Dkt. #85-6, ¶ 7.

On September 28, 2011, PA Graf examined plaintiff and noted no signs or symptoms of urinary problems or bowel issues and noted "abdomen positive bowel

sounds, soft non-tender and non-distended," prompting a diagnosis of muscular pain. Dkt. #85-6, ¶ 8. As Robaxin was not indicated, PA Graf denied plaintiff's request for renewal of this pain medication, prescribing Motrin instead. Dkt. #85-6, ¶ 8.

Plaintiff transferred to the Great Meadow Correctional Facility ("Great Meadow"), on September 30, 2011. Dkt. #85-6, ¶ 9. Plaintiff affirms that the physician at Great Meadow, Dr. Maddox, advised him that his test results are inconsistent with his description of pain in the left flank; an umbilical hernia can remain untreated for many years; and all of plaintiff's complaints are consistent with arthritis. Dkt. #83, ¶ 75.

## DISCUSSION AND ANALYSIS

Defendants argue that they were not indifferent to plaintiff's medical needs and provided plaintiff with adequate medical care. Dkt. #85-2.

Plaintiff questions the appropriate treatment for his diagnosed conditions and generally complains that his complaints of pain were not adequately managed. Dkt. #88, pp.10 & 54. Plaintiff argues that nothing was done for his degenerative bone diagnosis and that the urachal remnant has not not been removed despite his complaints of left flank pain. Dkt. #88, pp.10 & 14. Plaintiff states that other prisoners have received treatment for hernias and expresses concern that a hernia containing bowel can burst and the waste could infect his blood. Dkt. #83, ¶ 67 & Dkt. #89, p.3. Plaintiff specifically complains that RN DeLauro failed to abide by the NYSDOCCS Health Service Policy Manual, which requires referral to appropriate medical care

following multiple unresolved complaints about the pain in his left side. Dkt. #88, pp.4 & 36. Plaintiff also argues that Dr. Canfield failed to appropriately respond to his request for an HIV test[1] and that Dr. Canfield and Dr. Evans failed to order diagnostic tests to determine the cause of his severe left flank pain. Dkt. #88, pp.8, 39 & 46. Plaintiff argues that Dr. Rao failed to follow recommendations of other physicians and denied plaintiff pain medication. Dkt. #88, p.46. Plaintiff also argues that NP Ruiz failed to provide adequate pain medication to plaintiff. Dkt. #88, p.42.

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[1] Plaintiff was tested for HIV on July 28, 2010. Dkt. #45-3, p.17.

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

**Deliberate Indifference to Serious Medical Needs**

In *Estelle v. Gamble*, the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104 (1976). To establish an unconstitutional denial of medical care that rises to the level of an Eighth Amendment violation, a prisoner must prove, beyond mere conclusory allegations, that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104. More specifically, the prisoner must demonstrate both that the alleged deprivation is, in

objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995). Both the objective and subjective components must be satisfied in order for a plaintiff to prevail on his claim. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Under the objective component, in assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.* The alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

Where the claim is that the care provided was inadequate, plaintiff must demonstrate that, as an objective matter, the alleged deprivation of adequate medical care was sufficiently serious, *i.e.*, that he "was actually deprived of adequate medical

care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). In making this determination, courts assess whether the inadequacy in medical care is sufficiently serious, *i.e.*, "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280.

The subjective component for a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66, *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In *Estelle*, the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment. *Estelle*, 429 U.S. at 104-05.

"The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hathaway*, 99 F.3d at 553, *citing Farmer v. Brennan*, 511 U.S. 825 (1994); *see also Hernandez v. Keane*, 341

F.3d 137, 144 (2d Cir. 2003), *cert. denied*, 543 U.S. 1093 (2005).  The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-06.  Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id*. at 106; *see also Chance*, 143 F.3d at 703 ("[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").  Indeed,

> it is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.

*Chance*, 143 F.3d at 703.  Thus, "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady" will not constitute deliberate indifference.  *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000).  However, "[p]rison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors."  *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

Setting aside the question of whether plaintiff's subjective complaints of left flank pain constitute a serious medical need, it is clear that defendants were not deliberately indifferent to plaintiff's complaints. To the contrary, plaintiff received ongoing examinations by NYSDOCCS medical providers and multiple consultations with a rheumatologist, along with a broad array of diagnostic tests, including urinalysis, blood work, a bone scan, an MRI of the pelvis and a pelvic CT, none of which revealed an objectively serious medical condition. Moreover, plaintiff's complaints of pain were not ignored, but were treated with analgesics and muscle relaxants. Accordingly, it cannot be said that plaintiff was deprived of adequate medical care.

## **CONCLUSION**

For the foregoing reasons, it is recommended that defendants' motion for summary judgment (Dkt. #85), be granted.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order**. *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

  **SO ORDERED.**

DATED:   Buffalo, New York
             August 15, 2013

                                                  **s/ H. Kenneth Schroeder, Jr.**
                                                  **H. KENNETH SCHROEDER, JR.**
                                                  **United States Magistrate Judge**